Next call the case of Eddie Cherys v. U.S. Mr. DeRuzo. Good morning again, Your Honors. May it please the Court, Joseph DeRuzo, along with Jeffrey Molinaro, on behalf of Eddie Cherys. I'd like to reserve four minutes for rebuttal. That request will be granted. Your Honors, this is the second time this case comes before this Court. Previously, this case was before this Court. It was reversed, remanded, backed onto the District Court to hold an evidentiary hearing as to the merits of my client's 2255 petition. During the course of that time, after the initial remand and before disposition, a lot occurred. But what I think is important to note at the outset is that the initial 2255 petition that my client filed all the way back in calendar year 2001, he was still in custody at that time. Now, why this is significant is because this Court's case law is clear. When a petitioner is in custody, at the time the petition is filed, it is a 2255 and a 2255, no other. And as a result, a writ of quorum nobis is not appropriate. And why does that make a difference? Well, it makes all the difference, I won't say, under the facts of this case. But conceptually, a quorum nobis writ is harder to obtain. And it obviously instructs both this Court's and the Courts below view of the facts in order to whether a petitioner has carried his burden in order to... It is, which is somewhat odd, but you can blame that oddity on Congress in the enactment of 2253. But here we stand. So I would submit that, in particular, when I argued to the Court below, and I was very clear, and I believe the transcript so reflects that the Court should consider it as a 2255 and not as a quorum nobis. But you asked for quorum nobis in the District Court itself. Initially I did, because initially the Court ruled that when I asked for quorum nobis because I knew what was going to happen. My client was going to get deported, and I was very concerned that that might moot out the issue. The Court denied that conversion and cited to the Coomarsmi case, which that footnote says, at the time this habeas petition was filed, and that's when it's a 2255. So subsequent, then the Court reversed itself after my client was deported and said this case is moot. And I was clear when I was arguing before the District Court, everything I was doing was trying to protect the record. I knew that this was a possibility. I'm trying to protect the record. If I can't get habeas, well, then I want a quorum nobis. Under some form, I'm looking for a merits determination, and I'm trying my best to make sure I'm procedurally not headed off at the pass. Well, yeah, but the point is that originally you're right. It was a 2255. However, you asked for it to be a quorum nobis, and we could look at this as invited error. You can't argue that once you ask a court to do something and then on appeal say the court should have done what I requested it to do. But, Your Honor, I would say I was explicit at the oral argument on reconsideration. I couldn't have been any more explicit. I told the District Court I did not want to convert it to quorum nobis. It had to review it as a 2255, and I was also explicit. I said, no uncertain terms, I withdrew that motion to convert it to a quorum nobis. So to the extent that this Court thinks it's an invited error, I would say that that error, to the extent that I invited it, I took it back. And I took it back before the Court rendered its merits-based decision. So to get here, you need a COA. Indeed, I did, with the District Court granted. And when I moved to move this Court to expand the COA, because, naturally, this Court needs to determine in the first instance what are we dealing with. Are we dealing with a 2255, or are we dealing with a quorum nobis? I thought we were dealing with a 2255. But to resolve that and to make sure all of those procedural Ts were crossed and Is were dotted, I moved this Court to expand the certificate of appealability to at least consider that issue. Roberts. Okay. So moving back on to the second point, the Cape May Green issue, I would submit that this case, as a 2255, is either a civil case or it's a quasi-civil case. But regardless, this Court's case law is clear. Be it civil case, be it criminal case, that a premature notice of appeal can ripen. And in this case, it did. And the pole star for this Court's determination is prejudice. In this particular case, there can be no prejudice because the issues that are briefed on appeal are the issues set forth in a certificate of appealability. So to the extent that the government could ever claim prejudice, I would say it can't. It never moved to dismiss. It never brought up the issue. I amended the notice of appeal the very same day that this Court, I believe, that Judge Jordan issued the order on May 8th. And notwithstanding that, the COA details what exactly we're here for. So this is not a case of a full-blown civil trial, motions for summary judgment, motions for judgment on the pleadings, evidentiary issues, Rule 60 issues. No. We don't have all these full hodgepodge of issues. The issues are circumscribed to what is in the certificate of appealability. As a result, under no circumstances, especially in this case, can the government say that it was prejudice and as a result the Kate May Green Doctrine. Roberts. Why don't you get to the merits of the case, then? Okay. Well, Your Honors, the attorney, the merits, the fundamental problem with the decision below is that the district court inverted its analysis. There are two issues that I advance. One, whether my client was, showed a reasonable probability that he was incompetent during the time of trial, and two, whether there was ineffective assistance of counsel. The decision below addressed the first prong, and it's ineffective assistance, never got to the second prong. I submit that was fundamental error, because if the court was going to take a look at the two prongs under IAC, under the circling standard, in this case, the second prong, the prejudice, is the same analysis in respect to whether my client has shown a reasonable probability that he was, in fact, incompetent during the course of trial. Well, skipping the prejudice, going to the incompetence issue, there were no facts brought to the attention, at least the district court indicated there were no factors that were brought to the trial counsel's attention, which would have indicated to trial counsel that his client was incompetent. Well, one, yes, that was what the district court said, but I believe objectively the facts belie that, because You think what? The objective facts belie that conclusion. Oh, I thought this was a question of fact that was adjudicated by the district judge. And true, but its adjudication on that question of fact was incorrect. And the reason why is this. It has to be, you have to show it's clearly erroneous, do you not? And I believe it is clearly erroneous, and the reason is Exhibits 3 and Exhibits 4 that are made part of the record that are found at Joint Appendix Numbers 159 and 160. And those were respectively a certified copy of a letter from my client to the district court, that was Exhibit 3, and in Exhibit 4, a certified copy of my client's pro se motion for a new trial. And those two exhibits show that my client wrote to the district court and brought to the district court's attention, not in the case below, in the underlying criminal case, that my client was medicated. So I have a substantial ---- Those exhibits show that they were sent to counsel? No. And that's the problem, Your Honor, because, and I had a discussion with Judge Gomez, is I take the position, and I think it's more than reasonable. If you're litigating a case, if I'm trial counsel, I have either active or actual or constructive knowledge of every single document in that court file, especially after verdict, before sentencing, before notice of appeal. Now, this is not ---- this happened in 2000 and ---- In the fall of 2001. 2001. This is before the era of CMECF. You're expecting counsel to go and check the record every day? You're saying constructive notice, but that doesn't give counsel actual notice. I would agree. But the problem with that analysis ---- Your Honor, if you were doing this in 2001 with your offices on the mainland, would you want to be told you have to come and check the record every day? Me personally, as an attorney, no. But the analysis isn't from the standpoint of the attorney. It's from the standpoint of the litigant, the criminal defendant. So ---- I understand that, but how can you then find that the attorney's representation was deficient if they didn't know? Your Honor, I would submit he should have known. They should have known because there were filings on the docket, which would have indicated that the client was medicated. Exactly. Let me, if I can switch the analysis this way. Courts have consistently stated, in respect to the litigants, the litigants are on constructive notice of what the attorneys get, what's in the court file. I would submit this has to be a two-way street. Why is it that the litigants are on constructive notice of what their attorneys find out, notwithstanding that their attorneys didn't tell them, and not the other way around? I would submit that, as a matter of public policy, it would be extremely poor public policy for this court to say, you know what, it was in the court file. These are certified copies that were before the district court. But you know what, it's okay. As long as trial counsel didn't have actual knowledge of it, we need not consider it. I would extremely urge this court not to take position. Trial counsel, of course, testified that he had no knowledge of anything, any medication or any impropriety or deficit in his client's ability to cooperate. But you're asking us to extend the competency of counsel to taking notice of things which are on the record and that he should have, in good representation, have been deemed to have known. And does some attendant due diligence. Is that stretching the competence requirement beyond any case that we know of? Your Honors, all I can say is, in the context of other civil cases where it's, you see it a lot in 2254s and habeas cases. And if I'm remembering correctly, that case that came out of the Supreme Court about the habeas petitioner in Alabama, where the court went through the analysis of an abandonment of the client. I think the point I'm trying to make, though, is it's incumbent upon the trial attorney to do his job. And that would include, at a minimum, being aware. Especially, this is not after the case was closed. We have sentencing, notice of appeal. No, this is just after verdict, before sentencing is argued, before notice of appeal. So this is not post after the fact. This is during the pendency, the heart of the case. Well, you know, very few people these days are not medicated with some medication, you know. And the fact that he's being medicated, that in and of itself, unless there's something beyond the usual medication for your whatever is bothering you. Well, Your Honors, I think it goes to the nature, extent, and timing of the medication. If someone's taking Advil or some penicillin, it's a no-brainer. But when you have psychotropic medication, that's a very different story. And here we have psychotropic medication. And the point I tried to raise below is my client's arguments were not of recent vintage. This is not after-the-fact arguments, after-the-fact construction of evidence in order to blow up his criminal conviction. The documents that were admitted into evidence, Exhibits I and Exhibits II, those were exhibits and documents prepared by the Federal government, by the Federal Bureau of Prison that no one has ever disputed that show that he was initially on Depakote and that his treatment plan didn't work. And as a result, after the trial, they upped the treatment plan from Depakote to lithium. During and before the trial, according to the testimonies, I recall it, trial counsel testified and was accepted by the judge that his client seemed normal, as any criminal defendant can be normal going through trial. There's no indication that he was anything other than able to assist in his defense. No, no. And the reason why that is because I don't know if this particular panel is familiar with Courtroom No. 2 on St. Tom's, the small courtroom. The way that that courtroom is configured is you have a very, it's very small. You've got one or two seats for defense counsel. It was a multiple-person trial. And as a result, the clients, they weren't sitting with defense counsel. They were sitting behind defense counsel the entire time. And as a result, my client's interaction with her trial attorney was extremely limited. So as it is, it was this trial. I want to say it was a 3 or 4-day trial. The trial counsel said he did meet with her, I think, a few times. Meet with the client. And his testimony was that there was nothing untoward about the ability of the client to go forward. Undoubtedly so. What we're stuck with here, quite frankly, what you're stuck with is that a fact determination was made by the district court. And your position is that it's a reasonable risk that the district court should have taken into account and required that the notice that trial counsel didn't know about, but which was available from other records, made the fact finding inaccurate. Well, I think it was important to note what the district court did not find. The district court found, under Strickland, no unreasonable performance. Never addressed the prejudice. And it all... The court didn't need to address prejudice. I'm sure, absolutely, under our Strickland analysis. But that didn't obviate the analysis for purposes of whether, standing alone, my client showed a reasonable probability that he was or may have been incompetent. That claim, by itself, is a stand-alone claim. That's separate and apart from a Strickland analysis. So if the court had determined that that stand-alone claim didn't, wasn't meritorious, it could then, for the purposes of the Strickland analysis on the second portion, find no prejudice, therefore no IAC. But the court never made, and I urge this court to review the court below's opinion, it never addressed, it never articulated that stand-alone reasonable probability that my client was incompetent during the course of trial. We'll have you back on rebuttal. Mr. Jones. May it please the Court, good morning. Nelson Jones for the United States. The mandate from the panel of this court was for the district court to conduct an evidentiary hearing to determine whether there was ineffective assistance of counsel. That was the mandate from this court. The district court did that. They held an evidentiary hearing. They heard testimony from Eddie Cherries. They heard testimony from the trial counsel, Anna Pajwanski. What was clear after the testimony was that Anna Pajwanski, the trial counsel, had absolutely no knowledge from anyone that Mr. Cherries was suffering from any mental impairment. There was no information given to her by either the Bureau of Prisons, by the court, by the marshal service, or even by her own client. Mr. Cherries himself admitted that he never told Anna Pajwanski. In fact, it was contradictory testimony from Mr. Cherries, because at one point he said he could not communicate with her, and then when he was cross-examined at the hearing, he said he had no problem communicating with her. And, in fact, Attorney Pajwanski testified that, in fact, she met face-to-face with Mr. Cherries several times during the trial, that he understood what was taking place, he knew what was happening, the procedure was being followed, and that she spoke to him in Spanish, because that was his native language. Yeah, yeah, but before the trial started, I think the record reflects, it was a brief, that he suffered a psychological or psychotic problem at the institution. This was before the trial even started. That was the weekend before the trial. The weekend before the trial. He had a psychological or psychotic episode, I think they said. And then trial counsel was totally unfamiliar with that fact, that this is a client that I assume he would have seen her immediately before trial. I think the important thing with that, John, is that the defendant was kept in Puerto Rico until just prior to trial.  He was then brought to St. Thomas for trial that Sunday or Monday. The trial was started that Monday. The trial lasted five days. Attorney Pajwanski testified that she met with her client every day, face-to-face, spoke to him. There was nothing different between the time that she spoke to him during trial and the time that she spoke to him prior to trial. Well, if he knew about the psychotic episode at the institution, plus there was something with Dr. Gomez's report, I think, wasn't there? That was not presented prior to trial. The first that Attorney Pajwanski testified that she had any information concerning any psychotic episode by Mr. Terry's was in 2011, 10 years later. That was the first time she heard anything about any psychotic episode. Attorney Pajwanski testified that she met with him, she spoke to him, there was no problems. He never told her he was dizzy. He never told her he was sleepy. And she observed him every day. Well, how about the major articulated premise of your adversary is that counsel should be charged with information which is on the record concerning the client that he's representing in a criminal matter, and if he doesn't know what's going on on the record, that he's incompetent. But the problem with that is that the record was not established until after the trial. The pleading that was filed by Mr. Terry's was filed on November 4th. The trial was concluded by October 5th, I believe it was. The first pleading was filed by Mr. Terry's November 4th after the trial was concluded. And as the court indicated, as Judge Fischer has indicated, there was no indication that anybody had been served. The government had not been served, nor was Attorney Pajwanski served. The bottom line is that Attorney Pajwanski was never informed concerning any medical condition of her client. And let's assume for purposes of this argument that he was under these medications. The main question then becomes whether the defendant had the present ability to consult with his defense counsel with a reasonable degree of rational understanding and whether the defendant had a rational as well as factual understanding of the proceedings. Now, according to Attorney Pajwanski, the answers to those questions are in the affirmative. How could he consult with counsel when he's schizophrenic, bipolar, disorder of some sort? According to the records. Dr. Govez, I think, said he was bipolar, schizophrenic. That diagnosis was made after the trial. Because he just started the medication approximately three or four days prior to the start of the trial. And the question that the court had with respect to Mr. Terry's claim was he sat there in court with Attorney Pajwanski, but as soon as the trial was over, then he was able to prepare a 16-page pro se document claiming this medical condition when he sat there before with Attorney Pajwanski for a week and never said a word. And there's no evidence contradicting Attorney Pajwanski's testimony that he never told her, even as he sat there with her, that he was having problems understanding what was going on. He never said. In fact, Attorney Pajwanski testified that she spoke to him face to face. She explained what was going on to him. He said he understood. That was her testimony, and that has not been controversial. With respect to the ---- Mr. Jones, should the court have ordered a medical evaluation for Mr. Terry's in the course of taking evidence on the 2255 petition? I don't think it would have helped in this particular instance because by this time 10 years had passed. So I don't think it would have helped in this particular instance. The bottom line is at the time of the trial and shortly thereafter, whether Mr. Terry's had notified his client, had notified anybody, according to Mr. Terry's, he didn't tell anybody about these problems he claimed he was having. He told nobody. He probably thought he was fine. And Attorney Pajwanski thought he was fine because he was, in fact, fine. But the question is whether counsel should have known that he wasn't fine. She couldn't know. According to Attorney Pajwanski, he acted the same way prior to trial as he did during trial. There was absolutely no difference, none whatsoever. Do you think that based on the totality of the record, that even if counsel had been aware of his letter to the court and the contents of his motion for a new trial, that that alone would have been sufficient to make counsel believe that he was incompetent? No. No, because as Judge Cohen has indicated, a person will be under medication and they're fine once they're medicated. The question then becomes whether they have the ability to consult with defense counsel, whether they have rational understanding of what the proceedings are. And the government's position is he had both. He was able to consult with counsel as counsel testified that he did consult with her. She explained everything to him. He knew what the procedure was and also that he understood what the proceeding was. And to claim subsequent to trial that, okay, I was under these psychotropic drugs and therefore I didn't know what was going on, it belies the facts of the record. It belies the facts of what Attorney Pajwanski testified to. And my brief also indicated to the court that if there was an issue with respect to Mr. Cherry's behavior or demeanor during trial, the trial judge would have seen it and he had the authority to request a competency hearing. And he didn't feel or didn't see anything that required that to be done. If there are no further questions, that's my presentation. Thank you, Judge. Mr. Pajwanski. Your Honors, I believe the dispute at the court is the standard. This court has stated in Hull v. Kyler, we emphasize that our task is not to determine whether there is a reasonable probability that Hull would not have been convicted absent his counsel's errors. Rather, we are assessing whether there is a reasonable probability that he would not have been found incompetent to stand trial if not for the deficient performance of his attorney. It's a reasonable probability standard. And that reasonable probability is not preponderance of the evidence. It's not clear and convincing. A reasonable probability. Now, what is the testimony that the district court had before it? The testimony was from my client, who stated that he was having hallucinations, that he was communicating to Jesus or God, and that he was, as a result of his psychotic episode, prescribed rispidone by Dr. Gomez. That's exhibit number one. That is uncontroverted. People do not get prescribed psychotic, psychotropic medicines for no reason, especially by the Federal Bureau of Prisons. If anyone is particularly acutely aware of when criminal defendants need medication and when they don't need medication, I would submit it's the Federal Bureau of Prisons. But then, to make it worse, that treatment plan, for lack of a better term, was determined to be inappropriate, and it was upped to lithium. I would submit that that is a very significant fact, and that's exhibit two. Before this court has found a joint appendix 158. That fact has never been controverted. Between exhibit one and exhibit two, there's more than a reasonable probability that my client was incompetent during the course of trial. Now, going back to what the trial counsel said, I would submit trial counsel's subjective, subjective, non-expert view of whether a person is competent to stand trial cannot control an analysis. Because, as a result, you will have trial counsel always saying, oh, I was not ineffective. I thought my client was fine. That cannot control. It is objectively whether a criminal defendant is competent or not competent to stand trial. These are objective facts. These are not subjective facts. It's pretty difficult to make that determination ten years later, is it not? Absolutely. And this Court has addressed that, and I believe it's the Hollis case. It basically stands to proposition on direct appeal, it's the government's burden of showing that the criminal defendant is competent. On habeas, it's the other way around. But it carves out an exception where that burden should be the traditional paradigm. It's the government's burden. Why? Because in cases like this where you have a retrospective view a decade later and I would submit you have to take into account the procedural posture. My client filed his 2255 in 2001. He had to writ the district court three separate occasions before the district court finally based a merits-based opinion, which I subsequently was appointed to, which this Court subsequently reversed. And then we have the subsequent litigation that I was involved with. It never should have taken over a decade for the merits-based opinion determination to ever come to pass. And if there's anyone to blame, I don't know who it is, but I know sure as well, it's not my client. And because of that, what's that? Is there anything on the record which answers why? No. Nope. I would submit my personal experience, perhaps the clerk's office wasn't as diligent as it should have been. I can only speculate as to the reasons behind the lack of inactivity, why the case languished below for years. But what is objectively undisputed is a 2001 case. Here we are at 2013. So I would submit, based on the evidence, based on the appropriate standard, the reasons articulated in my opening or my prior brief and today, that this Court should reverse and remand, and with instructions to grant the writ, or the alternative, reverse and remand for instructions to consider what was left undetermined below, whether there was reasonable probability that my client was incompetent during the course of this trial. Thank you very much. Thank you very much, Mr. DiRuso and Mr. Jones, for a very well-briefed and argued case. And we'll take the matter under advisement.